**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 3, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

| | |
|---|---|
| STATE OF KANSAS, EX REL. KRIS KOBACH, Attorney General; THE SUMNER COUNTY, KANSAS, BOARD OF COMMISSIONERS; CITY OF MULVANE, KANSAS; SAC AND FOX NATION OF MISSOURI IN KANSAS AND NEBRASKA; IOWA TRIBE OF KANSAS AND NEBRASKA,<br><br>　　　　Plaintiffs - Appellants,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR; UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS,<br><br>　　　　Defendants - Appellees. | No. 21-3097 |

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:20-CV-02386-HLT-GEB)**

_____

Mark S. Gunnison of Payne & Jones, Chartered, Overland Park, Kansas (Derek Schmidt, Attorney General; Jeffrey A. Chanay; Stephen Phillips; and Brant M. Laue, Attorneys, Office of Kansas Attorney General, Topeka, Kansas; Christopher J. Sherman, Stephen D. McGiffert, and Anna E. Wolf of Payne & Jones, Chartered, Overland Park, Kansas; David R. Cooper of Fisher Patterson Sayler & Smith, LLP, Topeka, Kansas; James A. Walker and Tyler E. Heffron of Triplett Woolf Garretson, LLC, Wichita, Kansas; Christopher C. Halbert of Halbert Law, L.L.C., Hiawatha, Kansas, with him on the briefs) for Plaintiffs-Appellants.

Tamara Rountree, Attorney, U.S. Department of Justice, Environmental & Natural Resources Division (Todd Kim, Assistant Attorney General, with her on the brief) for Defendants-Appellees.

———————————————

Before **BACHARACH**, **PHILLIPS**, and **EID**, Circuit Judges.

———————————————

**PHILLIPS**, Circuit Judge.

———————————————

A congressional command to compensate the Wyandotte Tribe for its claimed loss of millions of acres in the Ohio River Valley has morphed into a thirty-year dispute over ten acres in a Wichita suburb. In the 1700s, as settlers began occupying their land, the Wyandot people agreed to a series of treaties that removed them to present-day Kansas and then later to Oklahoma. In 1951, the Wyandotte Tribe sought compensation in the Indian Claims Commission. In the late 1970s, the Commission agreed that the treaties rested on "unconscionable" consideration and awarded the Wyandotte Tribe about $3 million in damages. In 1984, Congress distributed the awarded funds, earmarking $100,000 for the Wyandotte Tribe to purchase lands for the Secretary of the Interior to take into trust.

In 1992, eight years after Congress's enacted remedy, the Tribe used $25,000 of those funds to buy a ten-acre lot in Kansas called the Park City Parcel. The next year, the Tribe applied for trust status on the Park City Parcel under Congress's 1984 enactment, but the Secretary denied the application. The Tribe tried again in 2008, reapplying for trust status on the Park City Parcel

2

under Congress's 1984 enactment. The Tribe wished to set up gaming operations on the Park City Parcel once the Secretary approved the lot for federal trust status.

Since then, the State of Kansas has opposed the Tribe's efforts to conduct gaming on the Park City Parcel. The State has disputed the Tribe's claim that its purchase came from the allocated $100,000 in congressional funds. And the State has argued that no exception to the Indian Gaming Regulatory Act (IGRA) authorizes the Tribe to operate gaming on the lot.

In 2020, the Secretary rejected the State's arguments, approving the Tribe's trust application and ruling that the Tribe could conduct gaming operations on the Park City Parcel. The district court agreed. And so do we. We affirm the ruling that the Secretary was statutorily bound to take the Park City Parcel into trust and to allow a gaming operation there under IGRA's settlement-of-a-land-claim exception.

## BACKGROUND

### I.  Legal Background

In the early 1700s, the Iroquois Confederacy displaced the Wyandot people from their ancestral homes in present-day Ontario. The Wyandot migrated to lands in southeastern Michigan, northern Ohio, and western Pennsylvania. But near the end of the 1700s, American settlers began occupying these lands. To head off conflict, the United States entered a series of treaties with the Wyandot people, which ceded this land to the United States.

Under an 1842 treaty, the Wyandot people ceded millions of acres in the Ohio River Valley to the United States in exchange for lands west of the Mississippi River. Per the treaty's terms, the United States funded the Wyandot's acquisition of about 23,000 acres in present-day Wyandotte County, Kansas. But in 1855, the Wyandot agreed to dissolve and cede back to the United States all their Kansas holdings (except a tribal cemetery). Some Wyandot opposed the dissolution, and the United States soon after removed the dissenters to present-day Oklahoma. In 1867, Congress recognized those few dissenters as the Wyandotte Tribe, today known as the Wyandotte Nation.[1]

## A.    The Indian Claims Commission Act

Nearly a century later, Congress passed the Indian Claims Commission Act, Pub. L. No. 79-726, 60 Stat. 1049 (1946) (ICCA). The ICCA created the Indian Claims Commission (ICC), "a quasi-judicial body to hear and determine all tribal claims against the United States that accrued before August 13, 1946." *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1460 (10th Cir. 1987). Congress authorized the ICC to adjudicate "claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration,

---

[1] We refer to the Wyandotte Nation as "the Tribe." We note that the record reflects that the spelling of the Tribe's name has changed over the years from "Wyandot" to "Wyandotte."

mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity." § 2(3), 60 Stat. at 1050.

As an Article I court and agent of Congress, the ICC adjudicated Native American land claims for the U.S. government. Until then, "Indian tribes had to petition Congress for special jurisdictional acts authorizing the Court of Claims to hear their grievances against the United States." *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1152 (10th Cir. 2015) (cleaned up). The "chief purpose" of the ICCA was "to dispose of the Indian claims problem with finality." H.R. Rep. No. 1466, at 10 (1945). "A final determination against a claimant . . . shall forever bar any further claim or demand against the United States arising out of the matter involved in the controversy." § 22(b), 60 Stat. at 1055.[2]

Early on, the ICC "construed the ICCA as limiting the available relief 'to that which is compensable' in money." *Navajo Tribe*, 809 F.2d at 1461 (citations omitted); § 2, 60 Stat. at 1050. The ICC interpreted the ICCA as "reflect[ing] a congressional policy that tribes with valid claims would be paid in money" and that "[n]o lands would be returned to a tribe." *Navajo Tribe*, 809 F.2d at 1461 (citing *Authorizing Appropriations for the Indian Claims Commission for Fiscal Year 1977: Hearing on H.R. 11909 Before the Subcomm.*

---

[2] Indeed, the ICCA directs that ICC judgments become final when filed with Congress. *Id.* § 22(a), 60 Stat. at 1055; *see also United States v. Dann*, 470 U.S. 39, 46-47 (1985) (surveying legislative history to conclude that § 22(a) of ICCA meant that the ICC "should, unless reversed [by the Court of Claims], have the same finality as judgments of the Court of Claims" (alteration in original) (quoting H.R. Rep. No. 2693, at 8 (1946) (Conf. Rep.)).

*on Indian Affs. of the H. Comm. on Interior & Insular Affs.*, 94th Cong. 48 (1976)).

## B.    Congressional Enactments Responding to ICC Judgments

In July and August 1951,[3] the Tribe sued the United States in the ICC. The Tribe asserted aboriginal title to several tracts of land in northern Ohio, northeastern Indiana, and southeastern Michigan. The Tribe asserted that it had forsaken those lands in a series of unconscionable treaties with the United States between the 1790s and 1840s. In decisions on four separate dockets in the late 1970s, the ICC agreed that the consideration given for the lands "was so grossly inadequate as to render it unconscionable within the meaning of section 2(3) of the Indian Claims Commission Act." It ordered as compensation $561,424 for lands in north-central Ohio (Docket 139), $2,348,679.60 for lands in northwestern Ohio and northeastern Indiana (Docket 141), and $200,000 for lands in northwestern Ohio and southeastern Michigan (Dockets 212 and 213).

Soon after the ICC's final judgments, Congress appropriated funds to cover those judgments. Act of Dec. 20, 1982, Pub. L. No. 97-371, § 1, 96 Stat. 1813, 1813 (noting that funds "in satisfaction of judgments granted to the Wyandot" were "appropriated on October 31, 1978, and March 2, 1979"). But Congress waited until 1982 to enact legislation distributing the funds to the

---

[3] The ICCA set a five-year statute of limitations for all claims, ending five years "after the date of the approval of" the ICCA—August 13, 1951. § 12, 60 Stat. at 1052; *see also Navajo Tribe*, 809 F.2d at 1460-61.

Tribe and dictating how the Tribe could expend them. In that statute, PL 97-371, Congress distributed funds to cover the judgments in ICC Docket 139 and ICC Docket 141. *Id.* Of the total funds, Congress allocated $100,000 to "be utilized to purchase land for the tribe to be held in trust status by the Secretary [of the Interior]." *Id.* § 3(b)(1), 96 Stat. at 1813.

In 1984, Congress repealed its 1982 law and enacted the presently operative statute detailing the distribution of the judgment funds. That statute, PL 98-602, distributed funds to cover judgments from all four ICC dockets, "provid[ing] for the use and distribution of certain funds awarded the Wyandotte Tribe of Oklahoma." Act of Oct. 30, 1984, Pub. L. No. 98-602, § 101, 98 Stat. 3149, 3149. PL 98-602 distributed to the Tribe about $4.7 million in funds,[4] 80% to the Tribe's members for compensation and 20% to the Tribe itself for land acquisition and tribal development. *Id.* § 105, 98 Stat. at 3151. To that end, Congress decreed that the funds allocated for land acquisition and tribal development "shall be used and distributed in accordance with the following general plan":

> (1) A sum of $100,000 of such funds shall be used for the purchase of real property which shall be held in trust by the Secretary [of the Interior] for the benefit of such Tribe.

---

[4] We assume the difference between the ICC awards (about $3 million) and the congressional distribution (about $4.7 million) accounts for "any interest or investment income accrued or accruing" on the ICC awards. § 101(a), 98 Stat. at 3149.

> (2) The amount of such funds in excess of $100,000 shall be held in trust by the Tribal Business Committee of such Tribe for the benefit of such Tribe.

*Id.* § 105(b)(1)-(2). By its terms, the statute allocates funds for separate purposes: (1) $100,000 to buy new land under section 105(b)(1) (which we'll call Section 105(b)(1) Funds), and (2) the remaining funds to be spent "for the benefit" of the Tribe (or Section 105(b)(2) Funds). *Id.* PL 98-602 also mandates that the Secretary of the Interior hold in trust any land purchased with Section 105(b)(1) Funds. *Id.* § 105(b)(1).

### C.    The Indian Gaming Regulation Act

In 1988, Congress passed the Indian Gaming Regulation Act, 25 U.S.C. §§ 2701-2721. Congress passed IGRA to "provide clear standards or regulations for the conduct of gaming on Indian lands" and "to promote tribal economic development, tribal self-sufficiency, and strong tribal government." *Id.* § 2701(3)-(4); *see also id.* § 2702(1) (declaring the purpose of IGRA as "provid[ing] a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development"). Indeed, Congress meant IGRA "to create a framework for states and Indian tribes to cooperate in regulating on-reservation tribal gaming." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1201 (10th Cir. 2018) (collecting cases).

Under IGRA's general rule, gaming "shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." 25 U.S.C. § 2719(a). But subsection (b)(1)(B)(i) provides

8

an exception when "lands are taken into trust as part of . . . a settlement of a land claim." IGRA does not define "settlement of a land claim." *See id.* § 2703.

In 2008, the Bureau of Indian Affairs promulgated regulations clarifying "[w]hen can gaming occur on newly acquired lands under a settlement of a land claim?" 25 C.F.R. § 292.5 (2008); *see also id.* § 292.1 ("This part contains procedures that the Department of the Interior will use to determine whether these exceptions [under IGRA] apply.").[5] The regulations provide "criteria for meeting the requirements" of IGRA's settlement-of-a-land-claim exception. 25 C.F.R. § 292.5. They set forth three ways for the Secretary to permit gaming on "newly acquired land":

- The Secretary "[a]cquired [the land in trust] under a settlement of a land claim that resolves or extinguishes with finality the tribe's land claim in whole or in part, thereby resulting in the alienation or loss of possession of some or all of the lands claimed by the tribe, in legislation enacted by Congress";

---

[5] The regulations define "land claim":

Land claim means any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:

(1) Arises under the United States Constitution, Federal common law, Federal statute or treaty;

(2) Is in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental); and

(3) Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.

25 C.F.R. § 292.2.

- The Secretary "[a]cquired [the land in trust] under a settlement of a land claim" that "[i]s executed by the parties, which includes the United States, returns to the tribe all or part of the land claimed by the tribe, and resolves or extinguishes with finality the claims regarding the returned land"; or

- The Secretary "acquired [the land in trust] under a settlement of a land claim" that "[i]s not executed by the United States, but is entered as a final order by a court of competent jurisdiction or is an enforceable agreement that in either case predates October 17, 1988 and resolves or extinguishes with finality the land claim at issue."

*Id.* § 292.5(a)-(b).

### D.    The Shriner Tract Litigation

In 1996, the Tribe bought a half-acre lot in downtown Kansas City, Kansas, called the Shriner Tract. Though that land is not at issue in the present appeal, the protracted litigation around it helps inform our analysis.

### 1.    The Shriner Tract Trust Determination

In 1996, the Tribe purchased the Shriner Tract for $180,000. To fund that purchase, the Tribe pledged the contents of an investment account (which included assets purchased with Section 105(b)(1) Funds) as collateral for a $180,000 loan with its investment broker.[6] Also during 1996, the Tribe applied

---

[6] These brokerage loans are called margin-account loans. As we understand it, the Tribe opted for a margin-account loan because "the interest expense [associated with the margin loan] incurred is less than the interest and dividend income earned on the investments."

PL 98-602 does not define how the Tribe may "use" its statutory funds to buy land. In the litigation following the Tribe's Shriner Tract purchase, the
*(footnote continued)*

to the Secretary to hold the Shriner Tract in trust. Later that year, the Secretary ruled that PL 98-602 mandated taking the Shriner Tract into trust and that IGRA authorized the Tribe to conduct gaming on the land under the statute's settlement-of-a-land-claim exception. In June 1996, the Secretary published notice in the Federal Register that the Bureau intended to hold the Shriner Tract in trust for the Tribe. *Indian Gaming*, 61 Fed. Reg. 29757, 29757-58 (June 12, 1996).

That notice spawned protracted litigation over the Shriner Tract. As relevant here, when the dispute first reached us, we remanded after being uncertain whether the Tribe had used solely Section 105(b)(1) Funds to purchase the Shriner Tract. *Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1263-64 (10th Cir. 2001). Our review of the administrative record left us unsure what funds the Tribe had expended in the purchase. We expressed concern that "documents in fact suggest that nearly half of the funds used to acquire the Shriner Tract were non-Pub. L. 98-602 funds." *Id.* at 1263. We identified, for instance, a letter from the Tribe that stated that the Shriner Tract

---

State "posit[ed] that the Shriner Tract was not purchased with Pub.L. 98-602 funds" because "the source of the $180,000 was a loan, and not the actual Pub.L. 98-602 funds." *Governor of Kansas v. Norton*, 430 F. Supp. 2d 1212, 1222 (D. Kan. 2006). The district court rejected that interpretation, ruling that the Secretary did not act arbitrarily and capriciously by allowing the Tribe to use Section 105(b)(1) Funds as pledged collateral for a loan on the Shriner Tract. *Id.* at 1223. We agree with the district court's analysis and find that the Tribe used its statutory funds by pledging its Section 105(b)(1) Funds as collateral for margin-account loans.

11

would be purchased with both "funds wired from the Pub.L. 98-602 trust account" and funds from "another tribal account." *Id.* (cleaned up). So we remanded to the Secretary for a more precise accounting of whether the Tribe had used solely Section 105(b)(1) Funds to purchase the Shriner Tract. *Id.* at 1264.

On remand, the Secretary determined that the Tribe had purchased the Shriner Tract solely from the $100,000 principal and the associated investment income from it. The Secretary relied on a report from an accounting firm, KPMG, that valued the Tribe's Section 105(b)(1) Fund principal and earnings at more than $212,000 when the Tribe purchased the Shriner Tract. *See Determination of Trust Land Acquisition*, 67 Fed. Reg. 10926, 10926 (Mar. 11, 2002) ("At the time of the July 12, 1996 disbursement of $180,000 for the Shriner's Building purchase, the remaining accumulated amount of section 602 funds and the dividends and interest of those funds, was $212,169.65."). The Secretary further interpreted PL 98-602 as authorizing the Tribe to use the $100,000 principal and accrued earnings on that principal to purchase the Shriner Tract.

The federal district court affirmed the Secretary's determinations that the Tribe had sufficient section 105(b)(1) principal and earnings to purchase the Shriner Tract. *Governor of Kansas v. Norton*, 430 F. Supp. 2d 1204, 1221-25 (D. Kan. 2006). And it affirmed that PL 98-602 required the Secretary to take into trust land that the Tribe bought with both section 105(b)(1) principal and

investment income on it. *Id.* at 1217-21. On appeal, we did not reach the merits because we ruled that we lacked appellate jurisdiction under the Quiet Title Act. *Governor of Kansas v. Kempthorne*, 516 F.3d 833, 846 (10th Cir. 2008), *abrogated by Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012).

Still, we may consider the district court's earlier merits-based opinion as persuasive authority. *Cf. Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1133 (10th Cir. 2010) ("Since the district court's opinions will remain 'on the books' even if vacated, albeit without any preclusive effect, future courts and litigants will be able to consult their reasoning." (cleaned up) (quoting *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 354 (D.C. Cir. 1997))).

In *Governor of Kansas v. Norton*, the district court reviewed the administrative record of the Tribe's Shriner Tract purchase and concluded that the Tribe had purchased the Shriner Tract solely with Section 105(b)(1) Funds and earnings. 430 F. Supp. 2d at 1223-24. The district court began by evaluating whether PL 98-602 authorized the Tribe "to purchas[e] the Shriner Tract with only the original $100,000, or if [it] may use additional interest or investment income accrued from the $100,000." *Id.* at 1218. It concluded that PL 98-602 was ambiguous on this question and afforded the Secretary's interpretation *Chevron* deference. *Id.* at 1218-20. In so holding, the district court deferred to the Secretary's position that the statute's including $100,000

13

for land acquisition did not exclude investment earnings from that principal amount to buy land under section 105(b)(1). *Id.* at 1219-20 ("Applying that guidance to Pub.L. 98-602, the Secretary concluded that because the purpose of Pub.L. 98-602 was to provide benefits to the Tribe by paying settlements awarded by the I.C.C., there was nothing indicating Congress intended to preclude the addition of investment income to the original $100,000, either in the legislative history or the record of the case.").

That decided, the district court turned to whether the Tribe had exclusively used Section 105(b)(1) Funds and earnings to buy the Shriner Tract. The district court affirmed the Secretary's determination that the Tribe had done so, concluding that substantial evidence supported the Secretary's finding. *Id.* at 1222. The district court also affirmed the Secretary's ruling that the Tribe could use a margin loan to purchase the Shriner Tract. *Id.* at 1222-23. And the district court approved of the Secretary's reliance on the KPMG report rather than competing evidence. *Id.* at 1223-25 ("The mere presence of contradictory evidence, however, does not invalidate [the agency's] actions or decisions." (citing *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1241 (10th Cir. 2000))).

### 2.    The Shriner Tract Gaming Determination

Later, in a separate appeal, the district court answered the second question pertinent to the Shriner Tract—whether IGRA permitted the Tribe to conduct gaming on the land. In *Wyandotte Nation v. National Indian Gaming*

14

*Commission* (the *Gaming Case*), the district court considered whether the Tribe

met IGRA's settlement-of-a-land-claim exception. 437 F. Supp. 2d 1193, 1207

(D. Kan. 2006). In doing so, it first addressed the meaning of the statutory term

"land claim." *Id.* at 1207-10.[7] The court noted that the National Indian Gaming

Commission had earlier ruled that ICC judgments are not land claims because

money judgments are not transfers of land parcels. *Id.* at 1208. The court

rejected that interpretation, concluding that "land claim" unambiguously

includes the "assertion[s] of an existing right to land." *Id.* The court ruled that

it did not matter whether "the remedy for a land claim is monetary, rather than

specific relief . . . where, as here, Congress mandated that the monetary remedy

be utilized to purchase land to be held in trust for the benefit of the Tribe." *Id.*

at 1210. In support, the district court recounted the statutory procedure under

PL 98-602:

> The NIGC's focus on the ICC money judgment might pass muster if
> the Tribe had merely purchased the Shriner Tract with money
> received from a claim brought before the ICC. That is not the case,
> however, because Congress mandated that $100,000 of the Tribe's
> ICC judgment funds be utilized to purchase land to be taken into
> trust for the benefit of the Tribe as a means of effectuating a
> judgment that resolved the Tribe's land claims. The Wyandotte used
> the funds appropriated by Congress in satisfaction of the ICC
> judgment to acquire the Shriner Tract, and the Secretary, based upon
> the mandate of Pub. L. 98-602, accepted title to the Shriner Tract in
> trust for the Tribe.

---

[7] The district court decided this case two years before the Bureau enacted
the 2008 regulations, so it did not analyze whether the Tribe could conduct
gaming under those regulations. Even still, the district court's analysis aligned
with the Bureau's later regulations.

*Id.*

## II.    Factual Background

At issue in this litigation is a ten-acre lot outside Wichita, Kansas, that the Tribe bought in 1992. As shown below, the accounting on this land purchase is complicated and disputed.

Soon after Congress passed PL 98-602, the Tribe received its $100,000 in Section 105(b)(1) Funds. Rather than immediately buy land with those funds, the Tribe invested them.[8] In 1986, the Tribe purchased roughly $95,000 in mortgage bonds with its Section 105(b)(1) Funds. It kept those bonds, investment income on the bonds, the remaining section 105(b)(1) principal, and interest on that principal in its A.G. Edwards account. Then in 1989, the Tribe transferred the holdings in its A.G. Edwards account to a new investment account with Mercantile, the '769 Account. By November 1991, the '769 Account reported a balance of almost $157,000—all in Section 105(b)(1) Funds and earnings.

The accounting of the Section 105(b)(1) Funds gets murkier from there. On November 21, 1991, the Tribe withdrew $25,199.67 from the '769 Account "in anticipation of the purchase of approximately 10 acres of land in Park City,

---

[8] For clarification, the Tribe maintained several investment accounts over the years. Those include an account with A.G. Edwards & Sons, Inc., and two accounts with Mercantile Investment Services, Inc., bearing account numbers 24067769 and 24067750. To distinguish between the two Mercantile accounts, we refer to them as the '769 Account and the '750 Account.

Kansas," known as the Park City Parcel. But the Tribe did not use that money to buy the Park City Parcel. Instead, the same day it withdrew the funds from the '769 Account, the Tribe redeposited the $25,199.67 into its general-investment account with Mercantile, the '750 Account. The '750 Account already contained other cash, bonds, and assets apart from the Section 105(b)(1) Funds. In December 1991, the Tribe further commingled the Mercantile accounts by closing the '769 Account and transferring its remaining holdings into the '750 Account.

Thus, by the beginning of 1992, the Tribe maintained a single investment account with Mercantile that contained not only the mortgage bonds purchased with Section 105(b)(1) Funds and the leftover section 105(b)(1) principal as cash but also all the investment income attributable to the Section 105(b)(1) Funds and unrelated cash and assets. And that's not all. Because of a title dispute over the Park City Parcel, the Tribe could not purchase that land until late 1992. To fund that purchase, it used $25,000 from the commingled '750 Account. We say "used" because the Tribe did not simply withdraw $25,000 from the '750 Account to purchase the Park City Parcel. Instead, the Tribe pledged the holdings in the '750 Account as collateral for a $25,000 margin-account loan from Mercantile.

Soon after purchasing the Park City Parcel, the Tribe asked the Secretary to hold the Park City Parcel in trust under PL 98-602. But in December 1995 the Tribe withdrew its application after a field office of the Department of the

Interior construed PL 98-602 as not mandating that the Secretary take the land into trust.[9]

Ten years later, in 2006, the Tribe reapplied to the Secretary to hold the Park City Parcel in trust. Though it initially applied for trust status under 25 U.S.C. § 465,[10] in 2008, it amended its application to claim trust status under PL 98-602. The amended application relied on the KPMG report and noted that "[KPMG] audited the original $100,000 allocated to the Wyandotte" and "deducted the $25,000 purchase price of the Park City [Parcel] from the 98-602 account." "The deduction," said the Tribe, "was consistent with the Wyandotte assertion that the land was purchased with [Section 105(b)(1) Funds]."[11]

The State of Kansas and a group of Native American tribes (Appellants here)[12] opposed the Tribe's application for trust status. The State submitted an accounting report from Gottlieb, Flekier & Co. to rebut the Tribe's application.

---

[9] We eventually overruled this interpretation of PL 98-602. In *Sac & Fox Nation*, we ruled that section 105(b)(1) of PL 98-602 unambiguously "imposed a nondiscretionary duty on the Secretary" to take land purchased with Section 105(b)(1) Funds into trust. 240 F.3d at 1262.

[10] Unrelated to PL 98-602, this statute permits the Secretary to take lands into trust "in his discretion" so long as the Secretary's acquisitions do not "exceed $2,000,000 in any one fiscal year." 25 U.S.C. § 5108 (original version at 25 U.S.C. § 465).

[11] To clarify, the KPMG report did not deduct or account for the $25,000 margin-account loan the Tribe used to purchase the Park City Parcel. Instead, it included the $25,199.67 withdrawal from the '769 Account as part of its review.

[12] We collectively refer to Appellants as "the State."

18

The Gottlieb report criticized the earlier KPMG report from the Shriner Tract litigation as overstating the investment income on the Tribe's Section 105(b)(1) Funds. Accounting for the $25,199.67 withdrawal from the '769 Account, the Gottlieb report contended that the Tribe had about only $161,000 in Section 105(b)(1) Funds and earnings in 1996. So, the Tribe could not have purchased the Shriner Tract for $180,000 with exclusively Section 105(b)(1) Funds and earnings. In other words, disagreeing with the KPMG report, the Gottlieb report concluded that the Tribe could not have afforded *both* the Shriner Tract and the Park City Parcel with its Section 105(b)(1) Funds and earnings.

In 2014, the Secretary denied the Tribe's trust application for the Park City Parcel. Based on the Gottlieb report, the Secretary agreed with the State that the Tribe had insufficient section 105(b)(1) principal and earnings to buy both the Park City Parcel and the Shriner Tract. "A finding that the Nation used [Section 105(b)(1) Funds and earnings] to acquire both Shriner Tract and the Park City Parcel is precluded," said the Secretary, "by the State's identification of issues surrounding interest-related deductions applied against the Nation's commingled account." But the Secretary kept the door open for the Tribe to rebut the Gottlieb report: "[T]he Nation [could] later . . . address the accounting issues raised by the State" and "submit a new application" for the Park City Parcel.

That rebuttal came in 2017 when the Tribe submitted a supplemented application for the Park City Parcel. The Tribe provided the Secretary with new

audited financial statements from 1986 through 1996 and an additional accounting report from RSM US LLP.[13] The RSM report recounted that the Tribe received congressional funds in 1986—$100,000 in Section 105(b)(1) Funds and the rest (about $839,000) in Section 105(b)(2) Funds. It then tracked the investment performance of the total funds, "allocat[ing] relevant income earned each year based upon the percentage of the beginning balance of the [Section 105(b)(1) Funds]." Put differently, the RSM report sorted the commingled funds by assigning annual pro rata shares of the earnings to the Section 105(b)(1) Funds. We summarize the RSM report's findings below[14]:

| Year | Beginning section 105(b)(1) balance | Total balance of congressional funds | Pro rata share of section 105(b)(1) balance | Net investment income on total balance | Share of earnings on Section 105(b)(1) Funds | Total Section 105(b)(1) Funds and earnings |
|------|------|------|------|------|------|------|
| **1986** | $100,000 | $938,706 | 10.65% | $81,306 | $8,661 | $108,661 |
| **1987** | $108,661 | $991,889 | 10.96% | $87,691 | $9,607 | $118,268 |
| **1988** | $118,268 | $989,588 | 11.95% | $85,503 | $10,219 | $128,487 |
| **1989** | $128,487 | $969,919 | 13.25% | $83,314 | $11,037 | $139,523 |
| **1990** | $139,523 | $994,440 | 14.03% | $75,636 | $10,612 | $150,135 |
| **1991** | $150,135 | $1,003,201 | 14.97% | $69,940 | $10,467 | $160,602 |

---

[13] The Tribe did not provide audited financial statements for the 1988 fiscal year.

[14] To account for the Park City Parcel purchase, the RSM report deducted $25,000 from the total Section 105(b)(1) Funds and earnings in 1993. To account for the Shriner Tract purchase, the RSM report deducted $180,000 from the total funds and earnings in 1996. The RSM report determined the beginning section 105(b)(1) balance of 1993 and 1996 by "prorat[ing] the amount of the land purchase based on the properties and reduc[ing] the beginning balance of the [section 105(b)(1) balance] accordingly."

| 1992 | $160,602 | $1,053,116 | 15.25% | $85,534 | $13,044 | $173,647 |
| 1993 | $154,468 | $805,758 | 19.17% | $74,699 | $14,320 | $162,967 |
| 1994 | $162,967 | $990,867 | 16.45% | $72,345 | $11,899 | $174,865 |
| 1995 | $174,865 | $889,871 | 19.65% | $66,585 | $13,084 | $187,950 |
| 1996 | $148,498 | $857,853 | 17.31% | $57,216 | $9,904 | $17,854 |

The RSM report concluded that the Tribe had enough Section 105(b)(1) Funds and earnings to purchase both the Park City Parcel and Shriner Tract. It determined that in October 1995 the Tribe had about $188,000 remaining in those funds. "This was sufficient and allowed for the withdrawal of $180,000 of the [Section 105(b)(1) Funds] for the acquisition of Shriner's property on July 12, 1996." The RSM report also noted that the Tribe still had about $18,000 in unexpended Section 105(b)(1) Funds and earnings after the Shriner Tract purchase.

We recognize that the reports recounted in this opinion vary in their accounting of the Tribe's $25,000 Park City Parcel purchase in 1992. For instance, the KPMG report and the Gottlieb report accounted for the Tribe's 1991 withdrawal of $25,199.67 but did not otherwise account for the actual $25,000 purchase price. On the other hand, the RSM report deducted $25,000 in 1993 to account for the Park City Parcel purchase. For clarity (and because each report deducted at least $25,000 from Section 105(b)(1) Funds), we regard the dispositive figure as $180,000. If the report concluded that the Tribe had more than $180,000 when buying the Shriner Tract (as the KPMG and RSM

reports did), then the Tribe had enough Section 105(b)(1) Funds and earnings to buy the Park City Parcel as well. If the report concluded that the Tribe had less than $180,000 (as the Gottlieb report did), the Tribe did not have enough Section 105(b)(1) Funds and earnings to buy both properties.[15]

## III.  Procedural Background

### A.  The Secretary approves the Tribe's application for the Park City Parcel.

In May 2020, the Secretary reconsidered the earlier denial of the Tribe's trust application. In a written decision, the Secretary (through the Assistant Secretary of Indian Affairs) analyzed the KPMG report and the Gottlieb report. The Secretary noted that "the KPMG Report found that there were sufficient [Section 105(b)(1)] Funds to allow the Nation to purchase both the Park City Parcel in 1992 and the Shriner Tract in 1996." App. vol. 2, at 17. The Secretary attributed the Gottlieb report's contrary conclusion to its having relied on "incomplete financial information because the Nation's account statements . . . were incomplete and 'entirely missing for the years 1992 and 1993, except for November[] 1993." *Id.* at 18. The Secretary identified other

---

[15] We note that the accounting reports all focus on the Tribe's financials as of 1996 when the Tribe purchased the Shriner Tract. Though we think the Secretary should have focused on whether the Tribe had sufficient Section 105(b)(1) Funds *at the time the Tribe filed its trust application* for the Park City Parcel under PL 98-602 (here, 2008), we do not think the Secretary acted arbitrarily and capriciously by relying on the Tribe's 1996 financials. Neither party has mentioned anything amiss with the Tribe's finances between 1996 and 2008. And we understand the Secretary's reliance on the 1996 timeframe as a natural offshoot of the protracted Shriner Tract litigation.

shortcomings with the data analyzed by the Gottlieb report, including incomplete copies of monthly investment statements. And she observed that "[t]he Gottlieb Report noted . . . that for purposes of complete documentation, [the accounting firm] would have preferred to review the audited financial statements for the Nation for the entire period of review." *Id.* at 18-19.

The Secretary then turned to the audited financial statements and the RSM report. After considering the Bureau's Office of Financial Management's review of both reports, the Secretary concluded that "the RSM Report's methodology, calculations, and assumptions are consistent with industry standards" and that "the RSM Report's conclusions are reliable." *Id.* at 21; *see also* App. vol. 14, at 68 ("[T]he RSM Report's conclusions are reliable under the consistency principle of General[ly] Accepted Accounting Principles (GAAP)."). To that end, the Secretary noted that the RSM report "deducted margin interest-related costs before the interest earned was attributed to the [Section 105(b)(1) Funds]," thereby "address[ing] the Gottlieb Report's critique of the KPMG Report." App. vol. 2, at 19-20. And the Secretary observed that "the growth of the [Section 105(b)(1) Funds] was not overstated" in the KPMG report. *Id.* at 20. In other words, the Secretary determined that the Tribe had enough Section 105(b)(1) Funds and earnings to cover both land purchases:

> Having found the RSM Report convincing and reliable evidence, we are persuaded by the report's conclusion that the [Section 105(b)(1)] Funds were sufficient to purchase both the Park City Parcel and the

Shriner Tract. We find that when the Nation purchased the Park City Parcel on November 4, 1992 it had sufficient funds to do so in [Section 105(b)(1) Funds]. The RSM Report and annual audits indicate that as of September 1, 1992, the [Section 105(b)(1) Funds] had a balance of $173,647. After the purchase of the Park City Parcel, the RSM Report showed the remaining balance in [Section 105(b)(1) Funds] was $162,967.

We also find that the RSM Report supports our previous conclusion that when the Nation purchased the Shriner Tract on July 12, 1996, it had sufficient funds in [Section 105(b)(1) Funds] to do so: The RSM report and annual audits indicated that as of September 30, 1995, the [Section 105(b)(1) Funds] had a balance of $187,950. This balance was sufficient to acquire the Shriner Tract for $180,000 the following year.

*Id.* at 22 (footnotes omitted).

The Secretary next addressed the separate question of whether the Tribe could operate gaming on the Park City Parcel. The Secretary ruled that the Tribe could do so, relying on the reasoning from the *Gaming Case* in the Shriner Tract litigation. *Id.* (citing 437 F. Supp. 2d at 1211).

## B.     The district court affirms the Secretary's trust and gaming determinations.

On appeal to the district court, the State challenged the Secretary's twin rulings that the Tribe had enough Section 105(b)(1) Funds to cover the purchase of the Park City Parcel and that it could conduct gaming on the land. *Kansas v. U.S. Dep't of Interior*, No. 20-cv-02386, 2021 WL 1784557, at *6 (D. Kan. May 5, 2021). The State also tried to rebut the RSM report with an affidavit from Jerrold Gottlieb (author of the Gottlieb report). *Id.* at *7. The

Department and the Bureau (Appellees here)[16] moved to strike that rebuttal, arguing that the district court could not consider material outside the administrative record. *Id.*

The district court affirmed the Secretary's decision in full.

*First*, the district court granted Appellees' motion to strike, reasoning that the Gottlieb affidavit did not warrant an exception to the rule that "[j]udicial review of an administrative action is generally limited to the record that existed before the agency." *Id.* at *7-8 (quoting *Citizens for Alts. to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007)). The district court deduced that considering the Gottlieb affidavit would circumvent the proper standard of review: "What the Court is concerned with now is whether there is substantial evidence to support the May 2020 Decision and whether it was arbitrary and capricious. What Plaintiffs have proposed is essentially new expert material that would introduce new conclusions on these issues." *Id.* at *8 (emphasis omitted).

*Second*, the district court ruled that the Secretary did not act arbitrarily and capriciously by concluding that the Tribe had sufficient Section 105(b)(1) Funds to purchase the Park City Parcel. It rejected the State's argument that the Secretary's ruling violated prior "policy," reasoning that the State had never identified any binding policy and that, in any event, the Secretary had

---

[16] We refer to Appellees collectively as "the Secretary" going forward.

explained any departure from the Shriner Tract rulings. *Id.* at *8-10. The district court further rejected the State's argument that the Tribe had expended all its Section 105(b)(1) Funds in the Shriner Tract purchase. *Id.* at *10-11. As the district court deduced, that argument ignored the purchasing history of the Shriner Tract and the Park City Parcel: "Both were purchased using margin-account loans against the value of the investments, including interest and earnings, purchased with the [Section 105(b)(1) Funds]." *Id.* at *11 (emphasis omitted). The district court similarly concluded that substantial evidence supported the Secretary's ruling because "the mere presence of contradictory evidence [did] not invalidate" the Secretary's ruling. *Id.* at *12 (quoting *Wyo. Farm Bureau Fed'n*, 199 F.3d at 1241).

*Third*, the district court ruled that the Secretary did not act arbitrarily and capriciously in relying on the *Gaming Case* in authorizing gaming under IGRA. *Id.* at *13-15. The State contended that the Secretary had ignored one of its own regulations, 25 C.F.R. § 292.5, meant to govern the meaning of IGRA's settlement-of-a-land-claim exception. *Kansas*, 2021 WL 1784557, at *13. But the district court did not fault the Secretary for failing to address the regulation. It reasoned that the *Gaming Case* "addressed the precise question before the agency" and that the Secretary could not ignore that case because otherwise "it would have 'entirely failed to consider an important aspect of the problem.'" *Id.* at *13-14 (second quoting *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1263 (10th Cir. 2020)). And the district court noted that the *Gaming Case*

26

did not conflict with 25 C.F.R. § 292.5 because the *Gaming Case* found no ambiguity in IGRA's settlement-of-a-land-claim provision. *Id.* at \*15 ("Although the focus of the arguments was on the phrase 'land claim,' nothing in [the *Gaming Case*] suggests that the overall 'settlement of a land claim' exception carried any ambiguity. Certainly, had that phrase been viewed as ambiguous at all, it's unlikely that it would have gone undiscussed.").

The State timely appealed.

## JURISDICTION

We have jurisdiction under 28 U.S.C. § 1291 to review the State's appeal of the district court's final affirmance of agency action. *See Farrell-Cooper Mining Co. v. U.S. Dep't of Interior*, 864 F.3d 1105, 1107 (10th Cir. 2017). We also have jurisdiction under the Administrative Procedure Act to review final agency actions. 5 U.S.C. § 704; *see also Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1230 (10th Cir. 2016).

## STANDARD OF REVIEW

The State appeals the district court's decisions to grant the motion to strike the Gottlieb affidavit and to affirm the Secretary's 2020 approval of the Tribe's Park City Parcel trust application.

We review a district court's ruling to strike for abuse of discretion. *See Durham v. Xerox Corp.*, 18 F.3d 836, 840 (10th Cir. 1994) (citation omitted). "Under this standard we will not disturb the district court's decision unless we have a definite and firm conviction that the lower court made a clear error of

judgment or exceeded the bounds of permissible choice in the circumstances." *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1016 (10th Cir. 2002) (cleaned up).

And we review a district court's rulings on agency actions de novo. *Pub. Lands Council v. Babbitt*, 167 F.3d 1287, 1293 (10th Cir. 1999) (citation omitted). To that end, "we owe no deference to the district court's decision." *Sac & Fox Nation*, 240 F.3d at 1260. Indeed, "in reviewing a district court's review of an agency decision, the identical standard of review is employed at both levels; and once appealed, the district court's decision is accorded no particular deference." *Valley Camp of Utah, Inc. v. Babbitt*, 24 F.3d 1263, 1267 (10th Cir. 1994) (citations and internal quotation marks omitted)). And we will not disturb agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## DISCUSSION

The State argues that the district court erred in three ways. First, it argues that the district court erred by striking the Gottlieb affidavit from its review. Second, it contends that the district court erred by not concluding that the Secretary acted arbitrarily and capriciously by taking the Park City Parcel into trust. And third, it argues that the district court erred in approving Park City Parcel for gaming. We consider each argument in turn.

## I. Motion to Strike

The district court struck the Gottlieb affidavit as extra-record material because the State did not present it during the administrative proceedings

below. *Kansas*, 2021 WL 1784557, at \*7-8. The court concluded that the affidavit was "essentially new expert material" that questioned the factual assumptions undergirding the RSM report. *Id.* at \*8 (emphasis omitted). The district court thus concluded that considering the Gottlieb affidavit would change the review from whether the Secretary had acted arbitrarily and capriciously to whether the RSM report was correct. *Id.*

We agree. Our review is ordinarily limited to the administrative record before the agency. *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1160 (10th Cir. 2022). We have permitted courts to supplement administrative records in "extremely limited" circumstances. *Id.* Those circumstances have not included allowing parties to introduce after-the-fact expert rebuttal evidence. *Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004) (affirming ruling to strike extra-record affidavit where affidavit "simply presents an expert opinion conflicting with the U.S. Air Force's conclusion"). To permit that rebuttal would subvert our standard of review, which asks whether the Secretary acted arbitrarily and capriciously based on the administrative record before it—not whether new evidence defeats the Secretary's prior reasoning.

We decline the State's invitation to "entertain arguments which should have properly been made before the agency in the first instance." *N.M. Env't Improvement Div. v. Thomas*, 789 F.2d 825, 836 (10th Cir. 1986).

## II.    The Secretary's Trust and Gaming Determinations

We turn next to the Secretary's trust and gaming determinations. We

review both under the Administrative Procedure Act, 5 U.S.C. § 706,

determining whether the Secretary's decisions are "procedurally defective,

arbitrary or capricious in substance, or manifestly contrary" to Congress's

directives. *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001).

> Agency action is arbitrary or capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1123 (10th Cir. 2009) (quoting

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983)). Our task is to determine whether "the agency decision was based on a

consideration of the relevant factors" and "whether there has been a clear error

of judgment." *Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1126 (10th Cir.

2020) (citation omitted).

In carrying out that task, we are mindful that our review under the

arbitrary-and-capricious standard is "a narrow one." *Ariz. Pub. Serv. Co.*, 562

F.3d at 1123 (citation omitted). Because we accord agency action "a

presumption of validity," challengers bear a heavy burden in convincing us that

an agency has acted arbitrarily and capriciously. *Wyoming v. U.S. Dep't of

Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (citation omitted). Indeed, we will

not disturb an agency's final decision when "the agency's decisionmaking process may reasonably be discerned," even if it rested on "a less-than-ideal explanation." *Ariz. Pub. Serv. Co.*, 562 F.3d at 1123 (citing *Alaska Dep't of Env't Conserv. v. EPA*, 540 U.S. 461, 497 (2004)). Nor will we substitute our own judgment for the agency's. *Mkt. Synergy Grp., Inc. v. U.S. Dep't of Lab.*, 885 F.3d 676, 683 (10th Cir. 2018) (citation omitted).

### A.    The Secretary did not act arbitrarily and capriciously in taking the Park City Parcel into trust.

We start with the Secretary's trust determination. The Secretary did not act arbitrarily and capriciously by taking the Park City Parcel into trust. The Secretary followed the mandate of PL 98-602 by assessing whether the Tribe had used Section 105(b)(1) Funds to purchase the Park City Parcel. § 105(b)(1), 98 Stat. at 3151. The Secretary recognized that the controlling question was "whether the Nation used [Section 105(b)(1) Funds] alone to purchase the Park City Parcel."

To answer that question, the Secretary considered three different accounting reports submitted by the Tribe and the State. First, the Secretary considered the KPMG report, noting that it "found that there were sufficient [Section 105(b)(1)] Funds to allow the Tribe to purchase both the Park City Parcel in 1992 and the Shriner Tract in 1996." Next, the Secretary considered the State's Gottlieb report, which identified inaccuracies in the KPMG report, such as its "fail[ing] to account for certain interest-related deductions applied

31

against the Nation's ['750 Account]." Finally, the Secretary considered the Tribe's RSM report to assess whether it corrected the deficiencies pinpointed by the Gottlieb report.

The Secretary noted that the RSM report relied on annual audits of the Tribe's statutory funding from 1986 to 1996, which "[t]he Nation had not previously submitted." Those audits reviewed the Tribe's three investment accounts, the A.G. Edwards account and the two Mercantile accounts. And the Secretary determined that the RSM report addressed the Gottlieb report's critiques by "deduct[ing] margin interest-related costs before the interest earned was attributed" to the Section 105(b)(1) Funds. As the Secretary detailed, "the Office of Financial Management reviewed the RSM Report and underlying financial statements" and "concluded [that] the RSM Report's methodology, calculations, and assumptions are consistent with industry standards." The Secretary further echoed the Bureau's Office of Financial Management's conclusion that the "RSM Report's conclusions are reliable under the consistency principle of General[ly] Accepted Accounting Principles (GAAP)."

The Secretary also discussed the shortcomings of the Gottlieb report. Though that report concluded that the Tribe lacked Section 105(b)(1) Funds to purchase both the Park City Parcel and the Shriner Tract, it had "analyzed incomplete financial information." The Secretary listed the Gottlieb report's deficiencies:

- Its "entirely missing" account statements "for the years 1992 and 1993, except for November 1993";

- Its "incomplete" copies of the monthly statements for the A.G. Edwards account from 1986 to 1989; and

- Its "incomplete" copies of the monthly statements for the Mercantile accounts from 1989 to 1991.

Further, the Secretary recited the Gottlieb report's own observation that "it would have preferred to review the annual audited financial statements for the Nation for the entire period of review."

We conclude that the Secretary did not act arbitrarily or capriciously by relying on the RSM report and the Office of Financial Management's approval of the Tribe's financials. The Secretary appropriately "considered the relevant data and rationally explained" the decision. *Ariz. Pub. Serv. Co.*, 562 F.3d at 1122 (citation omitted). Indeed, in resolving a complex accounting dispute, the Secretary reviewed relevant expert materials, explained the relevance and reliability of the expert materials, and sided with the more reliable report. The Secretary considered the conflicting Gottlieb report and explained how the later RSM report answered its deficiencies. And in any event, conflicting evidence alone is not enough to show that the Secretary acted arbitrarily and capriciously. *See Lockheed Martin Corp. v. Admin. Rev. Bd., U.S. Dep't of Lab.*, 717 F.3d 1121, 1129 (10th Cir. 2013) (noting that we will not "displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de*

33

*novo*." (citation omitted)). We cannot fault the Secretary's thorough administrative review. *See Citizens for Alts. to Radioactive Dumping*, 485 F.3d at 1099-1100 (affirming an agency as making no "clear error in judgment" when "[t]he i's were dotted, the t's were crossed" and the underlying statute "require[d] nothing more").

The State contends that the Secretary erred in relying on the RSM report. In its view, "RSM reported higher dollar values for the imputed earnings on the PL 602 Bonds" because it assumed that "the imputed earnings on the investment of the [Section 105(b)(1) Funds] were 'restricted' and could not be used for anything other than the purchase of land that was to be acquired in trust." In other words, the State contests that the RSM report's methodology was faulty because the report glossed over the actual commingling of the Tribe's Section 105(b)(1) Funds and earnings. But we are not troubled by the RSM report's methodology. Faced with multiple bank accounts and commingled funds, RSM devised a method that attributed a portion of the '750 Account's earnings to Section 105(b)(1) Funds. As stated, the Bureau's Office of Financial Management approved of this methodology. And despite the State's complaints of overstated earnings on Section 105(b)(1) Funds, the State did not identify any overstatements to the Secretary below. The Secretary did not act arbitrarily and capriciously by relying on an outside expert's report that used a reliable methodology to calculate the Tribe's Section 105(b)(1) Funds and earnings in 1996.

34

In reaching this decision, we consider and reject the State's three arguments that the Secretary acted arbitrarily and capriciously: (1) that the Secretary disregarded facts established in the Shriner Tract litigation; (2) that the Secretary violated Department policy in taking the Park City Parcel into trust; and (3) that the Secretary lacked substantial evidence to support its decision.

### 1. The facts established in the Shriner Tract litigation don't render the Secretary's trust determination arbitrary and capricious.

*First*, the State argues that the Secretary sidestepped relevant factual findings from the Shriner Tract litigation. This argument requires some unraveling. The State says that the Secretary "specifically found" during the Shriner Tract litigation that "all the $100,000 [Section 105(b)(1) Funds] were fully expended on and/or fully attributed to the purchase of the Shriner Tract." From this, the State argues that if the Tribe expended all its $100,000 section 105(b)(1) principal in the Shriner Tract purchase, it could not later claim that it purchased the Park City Parcel with those funds. And the State argues that the Tribe lacks statutory authority to use solely investment income derived from the $100,000 principal to purchase the Park City Parcel.

We reject this argument because the State misreads PL 98-602. Nowhere does PL 98-602 distinguish between section 105(b)(1) principal and its associated investment earnings. The section 105(b)(1) principal and earnings are one pool of funds available for purchasing land under that subsection.

35

Nothing depends on an artificial construct of the Tribe holding back $1 or more of section 105(b)(1) principal to use with the investment income. The money is fungible.

The unambiguous text of the statute supports this reading. Section 105(b)(1) allocates $100,000 to the Tribe, which "shall be used" on land purchases that the Secretary "shall" hold in trust. § 105(b)(1), 98 Stat. at 3151. On its face, the provision says nothing about investment income. But Congress surely envisioned that the Tribe could take some time to find the right land to buy and wouldn't have to suffer the lost time value of money while doing so. And if the investment income were not usable on its own, any earnings beyond the principal would have to rest forever in a financial account unusable to the Tribe—a reading not supported by the text.

Further, section 105(b)(1)'s silence on investment income is understandable because the sole allowed use of the funds is to purchase land that must be taken into trust by the Secretary. When investment income can be used for multiple purposes—as with the Section 105(b)(2) Funds—the statute listed those allowed uses (eight specified in that subsection). *See* § 105(b)(3), 98 Stat. at 3151. But because the statute confines any income on Section 105(b)(1) Funds to one use, Congress had no need to specify it. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888 (2019) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citation omitted)); *Jones v. United States*, 527

36

U.S. 373, 389 (1999) ("Statutory language must be read in context and a phrase gathers meaning from the words around it." (cleaned up)).

The State counters that PL 98-602 "contains no language suggesting that . . . imputed earnings alone can trigger the mandatory trust acquisition of [PL 98-602]." The State contrasts PL 98-602 with the Michigan Indian Land Claims Settlement Act, a statute specifying how certain Ottawa and Chippewa tribes could use accrued earnings. Pub. L. No. 105-143, § 107(a)(3), 111 Stat. 2652, 2658 (1997). Though similar language in PL 98-602 would support the State's position, the State does not argue why we should read these two statutes similarly.[17] Nor does the State acknowledge the counter: PL 98-602's silence *permits* the Tribe to use solely accrued earnings on Section 105(b)(1) Funds to purchase land. We cannot say that the Secretary erred by applying PL 98-602 to enable the Tribe to buy the Park City Parcel solely with investment income.

> ## 2.    Department "policy" doesn't make the Secretary's trust determination arbitrary and capricious.

*Second*, the State argues that the Secretary violated its own policy by taking the Park City Parcel into trust. The State directs us to memoranda prepared by the Secretary in the Shriner Tract litigation. According to the State, those memoranda "clearly communicated to the Wyandotte that once the

---

[17] "The adventitious occurrence of like or similar phrases, or even of similar subject matter, in laws enacted for wholly different ends will normally not justify applying the rule [of *in pari materia*]." 2B Norman J. Singer & Shambie Singer, *Sutherland Statutes and Statutory Construction* § 51:3 (7th ed. 2021) (collecting cases)).

$100,000 [Section 105(b)(1) Funds] were fully expended on land that was then placed in trust, that fulfilled the Department's trust acquisition obligation under [PL 98-602] and no further trust acquisitions could be predicated on [PL 98-602]."

We disagree. To start, like the district court, we doubt whether the Secretary had an established policy in 1996 of restricting future trust acquisitions. Many snippets identified by the State fail to qualify as "policy." "Policy statements include but are not limited to 'guidances, manuals, circulars, memoranda, [and] bulletins.'" *Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1262 (10th Cir. 2018) (alteration in original) (citation omitted). To that end, agency policy statements are often styled as such and widely distributed to agency officials. *Cf.* 5 U.S.C. § 553(b)(A) (noting that notice-and-comment procedure does not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice"); *Am. Bus Ass'n v. United States*, 627 F.2d 525, 529-31 (D.C. Cir. 1980) (describing general statements of agency policy). The State highlights internal memoranda and letters that generally describe PL 98-602 and the Tribe's intent to acquire the Shriner Tract with Section 105(b)(1) Funds. But we see nothing showing that department officials distributed the documents broadly—indeed two of the documents do not even appear to be memoranda and were attachments to two-party emails.

Further, we doubt that the Secretary's position in 1996 meant to keep the Tribe from not submitting future trust applications using only earnings on Section 105(b)(1) Funds. As stated, that "policy" would flout the plain text of PL 98-602, which neither restricts the Tribe from investing its $100,000 in section 105(b)(1) principal nor prohibits it from purchasing land with section 105(b)(1) earnings. And indeed, other record evidence reveals that the Secretary would not bar the Park City Parcel trust application under its "policy." For instance, in 1998, the Department's Director of Indian Gaming George Skibine testified that he believed the Tribe to be apportioning $25,000 of section 105(b)(1) principal to the Park City Parcel—even though the Tribe had no trust application for the lot pending before the Secretary.[18] We hesitate to impute to the Secretary a "policy" that lacks a textual and factual basis.[19]

And in any event, even if we accepted that the Secretary established as a "policy" that the Tribe could not submit future trust applications, the Secretary

_____

[18] We do not endorse the view that PL 98-602 permits the Tribe to refashion older land purchases as bought with Section 105(b)(1) Funds or that the Tribe may apportion its section 105(b)(1) principal between land purchases. Instead, the Secretary must assess whether the Tribe has sufficient section 105(b)(1) principal or earnings—as a single pool of funds—to purchase land at the time of the Tribe's trust application.

[19] Even if the agency had established as a "policy" that the Tribe could not buy lands solely with earnings on Section 105(b)(1) Funds, we would strain to accord that interpretation any degree of *Chevron* deference or *Skidmore* respect. *See Sac & Fox Nation*, 240 F.3d at 1260 (noting that we will not accept an agency's interpretation of a statute if it is "manifestly contrary to the statute" (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984))).

adequately explained any needed departure from that policy. "[An agency] need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In the 2014 decision, the Secretary explained that decisions in the Shriner Tract litigation "[were] made before the Department had the benefit of an accounting of the [PL 98-602 funds] to know how much the [PL 98-602 funds] had grown in value by July 1996." In other words, the Secretary explained that the Department lacked data in 1996 to know the status of the Park City Parcel trust application (i.e., whether the Tribe would have sufficient Section 105(b)(1) Funds or earnings to apply for trust status). We agree that under the prior policy, the Secretary could have considered that trust application.

### 3. Substantial evidence supported the Secretary's trust determination.

*Finally*, the State contends that the Secretary lacked substantial evidence to conclude that the Tribe used Section 105(b)(1) Funds and earnings to buy the Park City Parcel. It argues that we should credit the Gottlieb affidavit and conclude that the Secretary erred. But as detailed above, we will not consider this extra-record material. Further, "we may not substitute our judgment for

that of the agency on matters within its expertise." *Hays Med. Ctr.*, 956 F.3d at 1264 (citation and internal quotation marks omitted). Nor will we reweigh the evidence to get a different result. *Antelope Coal Co./Rio Tinto Energy Am. v. Goodin*, 743 F.3d 1331, 1341 (10th Cir. 2014) (citation omitted). And even if we considered the Gottlieb affidavit, we would still approve of the Secretary's and the Office of Financial Management's reliance on the RSM report. *See Lockheed Martin Corp.*, 717 F.3d at 1129.[20] Substantial evidence supported the Secretary's decision for the reasons stated.

*        *        *

We hold that the Secretary did not act arbitrarily and capriciously in approving the Tribe's application to take the Park City Parcel into trust. The Secretary considered relevant expert material and explained why those materials were persuasive. We cannot substitute our own judgment—with the benefit of hindsight—for that of the Secretary's. We affirm the Secretary's trust determination.

---

[20] Indeed, the State's argument appears to rest on the RSM report's treatment of a single investment. But argument over a single investment does not "overwhelm[]" the audited financial statements and accounting reports relied on by the Secretary and reviewed by the Office of Financial Management. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994) ("Evidence is not substantial if it is overwhelmed by other evidence . . . ." (citing *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990))).

**B.** **The Secretary did not act arbitrarily and capriciously in permitting the Tribe to conduct gaming on the Park City Parcel.**

We now consider whether the Secretary acted arbitrarily and capriciously by allowing the Tribe to conduct gaming on the Park City Parcel under IGRA's settlement-of-a-land-claim exception. Two relevant texts guide our discussion: the text of IGRA, 25 U.S.C. § 2719, and helpful regulations from the Bureau, 25 C.F.R. pt. 292. IGRA provides that

> Subsection (a) ["gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988"] will not apply when . . . lands are taken into trust as part of . . . a settlement of a land claim[.]

25 U.S.C. § 2719(b)(1)(B)(i). The follow-on regulations define "land claim":

> Land claim means any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:
>
> (1) Arises under the United States Constitution, Federal common law, Federal statute or treaty;
>
> (2) Is in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental); and
>
> (3) Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.

25 C.F.R. § 292.2. The regulations also help define the scope of IGRA's settlement-of-a-land-claim exception:

> This section contains criteria for meeting the requirements of 25 U.S.C. 2719(b)(1)(B)(i), known as the "settlement of a land claim" exception. Gaming may occur on newly acquired lands if the land at issue is either:

(a) Acquired under a settlement of a land claim that resolves or extinguishes with finality the tribe's land claim in whole or in part, thereby resulting in the alienation or loss of possession of some or all of the lands claimed by the tribe, in legislation enacted by Congress; or

(b) Acquired under a settlement of a land claim that:

> (1) Is executed by the parties, which includes the United States, returns to the tribe all or part of the land claimed by the tribe, and resolves or extinguishes with finality the claims regarding the returned land; or

> (2) Is not executed by the United States, but is entered as a final order by a court of competent jurisdiction or is an enforceable agreement that in either case predates October 17, 1988 and resolves or extinguishes with finality the land claim at issue.

*Id.* § 292.5.

The State charges that the Secretary erred under IGRA by permitting the Tribe to conduct gaming operations on the Park City Parcel. The State contends that the Secretary acted arbitrarily and capriciously by relying on the *Gaming Case*, which it argues was both "wrongly decided" and "distinguishable." It points to 25 C.F.R. § 292.5(b)(2) as the controlling law, correctly noting that this regulation requires a "settlement" that "resolves or extinguishes with finality" the Tribe's land claim. From that, the State contends that the regulation controls the dispositive inquiry: Was PL 98-602 a settlement that resolved or extinguished the Tribe's land claim with finality? The State answers no, reasoning that PL 98-602 was neither a settlement nor "a claim by the Wyandotte concerning the impairment of title or other real property interest

or loss of possession that conflicts with that claimed by an individual or entity."

The State's argument requires some statutory explanation. IGRA generally prohibits gaming on "lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." 25 U.S.C. § 2719(a). It excepts from that prohibition, however, "lands [that] are taken into trust as part of . . . a settlement of a land claim." 25 U.S.C. § 2719(b)(1)(B)(i). Based on the plain language of the statute, we glean three requirements to meet IGRA's settlement-of-a-land-claim exception: (1) Has the Secretary taken land into trust? (2) Was the land acquired under a settlement of a land claim? And (3) was the land taken into trust "as part of" the settlement of a land claim? We conclude that the Tribe clears these requirements.

### 1.    Has the Secretary taken the Park City Parcel into trust?

The Park City Parcel is land that the Secretary has taken into trust. As we've held, PL 98-602 "imposed a nondiscretionary duty on the Secretary" to take any lands purchased with Section 105(b)(1) Funds into trust. *Sac & Fox Nation*, 240 F.3d at 1262. And we've concluded that the Secretary's decision to take the Park City Parcel into trust was not arbitrary and capricious.

### 2.    Was the Park City Parcel acquired under a settlement of a land claim?

The Secretary also acquired the Park City Parcel under a settlement of a land claim. IGRA does not define "settlement of a land claim." For that, we

44

turn to the Bureau's regulations. The regulations define "land claim" to include claims on contested lands arising before October 17, 1988, and under a federal treaty. *See* 25 C.F.R. § 292.2. We know the Tribe claimed land in the ICC seeking compensation for acreage in the Ohio River Valley lost by treaties with the United States between the 1790s and 1840s. The Tribe and the United States also disputed title to those lands, as shown in the several ICC actions initiated by the Tribe. And the Tribe's claim for those lands arose several decades before October 17, 1988.

That leaves us to determine the meaning of "settlement." The Bureau's regulations again help here. As seen below, something cannot be a settlement unless it resolves the claim with finality:

> Gaming may occur on newly acquired lands if the land at issue is . . . [a]cquired under a settlement of a land claim that resolves or extinguishes with finality the tribe's land claim in whole or in part, thereby resulting in the alienation or loss of possession of some or all of the lands claimed by the tribe, in legislation enacted by Congress[.]

*Id.* § 292.5(a). The four ICC judgments meet this definition. *See Gaming Case*, 437 F. Supp. 2d at 1207 ("The claims asserted by the Wyandotte [before the ICC] involved determinations of (1) whether the tribes held recognized title to the property, and (2) if so, what percentage interest each tribe held."). Under the ICCA, the ICC judgments "resolve[d] . . . with finality the tribe's land claim" by resolving its land claims in northeastern Indiana, southeastern Michigan, and northern Ohio. § 22(a)-(b), 60 Stat. at 1055. The Tribe cannot

45

now relitigate its land claims in those states; the final judgments of the ICC already awarded about $3 million in damages.[21]

The State argues that we should limit "settlement" to include only traditional settlement agreements or congressional enactments resolving the land claims. We disagree. Generally, the term "settlement" refers to "[t]he settling or payment of an account" or "the act of satisfying a claim or demand." *Settlement*, *Oxford English Dictionary* (2d ed. 1989) (last updated Sept. 2021). This definition fits here, as Congress tasked the ICC with "determin[ing] all tribal claims against the United States that accrued before August 13, 1946." *Navajo Tribe*, 809 F.2d at 1460; *see also* H.R. Rep. No. 1466, at 10 (1945) (describing the "chief purpose" of the ICCA as "dispos[ing] of the Indian claims problem with finality"). In other words, Congress tasked the ICC with settling the United States' accounts with Native American tribes.[22] For similar reasons, we see no need to limit the term "settlement" to congressional

---

[21] Nor could the Tribe likely bring claims about any other holdings in the Ohio River Valley that it no longer occupies. Those claims are time-barred by the ICCA. § 12, 60 Stat. at 1052; *see also Navajo Tribe*, 809 F.2d at 1460-61.

[22] The State's limiting of "settlement" creates problems with 25 C.F.R. § 292.5(b)(2), which extends settlements of land claims to "a final order by a court of competent jurisdiction." If we were to restrict the term "settlement" to traditional written instruments, we would cut out potentially hundreds of claims resolved by final judgments of the ICC. *See Navajo Tribe*, 809 F.2d at 1461 n.12 ("By 1975, the Commission had established 613 dockets in the 370 claims which had been filed by Indian tribes. By 1977, awards by the Commission pursuant to the [ICCA] totaled in excess of $800,000,000." (citations omitted)).

enactments with the word "settlement" in the statutory title. The plain meaning of "settlement" encompasses more than congressional settlements.

### 3.    Was the Park City Parcel taken into trust "as part of" the settlement of a land claim?

That leaves us with the final question of whether the Secretary took the Park City Parcel into trust "as part of" the settlement of land claims. 25 U.S.C. § 2719(b)(1)(B). We conclude that the Secretary did. The Secretary's authority to take the Park City Parcel into trust arises from PL 98-602. § 105(b)(1), 98 Stat. at 3151. Though the ICC judgments alone did not (and could not) imbue the Secretary with that authority, the Secretary acquired the Park City Parcel in trust for the Tribe "in legislation enacted by Congress" and "as part of" (or in the regulations' terminology, "under") the ICC judgments. Congress enacted PL 98-602 as part of its duty to satisfy the Tribe's ICC judgments. *See* § 101(a), 98 Stat. at 3149 (providing that "the funds appropriated in satisfaction of" those judgments "shall be used and distributed as provided"). All to say that Congress would not have enacted PL 98-602 without the ICC judgments. PL 98-602 naturally arose from the ICC money judgments and dictated how the Tribe collected those monies.

We acknowledge that the Secretary did not engage in this statutory analysis and did not outwardly consider the effect of the Bureau's regulations, instead relying on the *Gaming Case*. "Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational

47

explanation for their departure." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002) (citing *Big Horn Coal Co. v. Temple*, 793 F.2d 1165, 1169 (10th Cir. 1986) (per curiam)). And agencies act arbitrarily and capriciously when they disregard their own regulations. *Cherokee Nation of Okla. v. Norton*, 389 F.3d 1074, 1078, 1087 (10th Cir. 2004). But the regulations lead to the same result as that reached by the Secretary under the *Gaming Case*.[23]

That's because the *Gaming Case* accords with our statutory interpretation of IGRA and the later-enacted regulations. There, the district court interpreted IGRA's settlement-of-a-land-claim exception and concluded that PL 98-602 arose from the ICC judgments:

> Congress mandated that $100,000 of the Tribe's ICC judgment funds be utilized to purchase land to be taken into trust for the benefit of the Tribe *as a means of effectuating a judgment* that resolved the Tribe's land claims. The Wyandotte used the funds appropriated by Congress in satisfaction of the ICC judgment to acquire the Shriner Tract, and the Secretary, based upon the mandate of Pub. L. 98-602, accepted title to the Shriner Tract in trust for the Tribe.

---

[23] We note that the State has asked us to reverse the Secretary's gaming determination and at least implicitly argues that we should adopt its interpretation of IGRA and the 2008 regulations. The briefing thus puts the 2008 regulations at issue before us for a legal determination. We do not understand the dissent to disagree with our interpretation of IGRA or the regulations. Nor do we see any sense in extending a multi-year case years further to resolve an issue now before us. *See City of Arlington Heights v. FCC*, 569 U.S. 290, 316 (2013) (Roberts, C.J., dissenting) (noting that "[t]he rise of the modern administrative state has not changed" our duty to say what the law is).

*Gaming Case*, 437 F. Supp. 2d at 1210 (emphasis added). We agree with the district court's reasoning in the *Gaming Case*, particularly that PL 98-602 "effectuat[ed]"—that is, was a part of or under—the ICC judgments. And because we agree that the *Gaming Case* correctly interpreted IGRA's settlement-of-a-land-claim exception, the Secretary did not act arbitrarily and capriciously by relying on it.

All told, the Secretary correctly concluded that the Tribe could conduct gaming on the Park City Parcel.

## CONCLUSION

We hold that the district court did not abuse its discretion in striking extra-record material from its consideration. And we hold that the Secretary did not act arbitrarily and capriciously by taking the Park City Parcel into trust or by ruling that the Tribe may conduct gaming on that tract. We affirm.

No. 21-3097, *State of Kansas, et al. v. Dep't of the Interior, et al.*
**BACHARACH**, J., concurring in part and dissenting in part.

This appeal grows out of a challenge to the Department of the

Interior's decision to

- take land into trust on behalf of the Wyandotte Nation and

- permit gaming on that land.

State and local governments and two tribes challenged the Department's

determinations as arbitrary and capricious, and the district court rejected

these challenges. Those governments and tribes appeal, and the majority

affirms. I largely agree with the majority, but write separately on two

issues:

1. **Whether the Department's memoranda created an administrative policy.** The governmental and tribal challengers argue that the Department should have followed its internal memoranda prohibiting the Wyandotte Nation from taking more land into trust. The Department explained that it had based this prohibition on outdated accounting, and the majority accepts the Department's explanation. Because the Department explained its reason for deviating from the memoranda, the majority correctly rejects this challenge. But the majority goes further, questioning whether the departmental memoranda had created an administrative policy. I see no need to opine on the existence of an administrative policy.

2. **Whether the gaming determination was arbitrary and capricious.** The governmental and tribal challengers also argue that the Department violated its own regulations when deciding to allow gaming on the new trust land. The Department responded on appeal that it had complied with the regulations, and the majority accepts the Department's response. But the Department needed to discuss the controlling regulations when deciding to allow gaming. In my view, the Department acted

arbitrarily and capriciously by failing to discuss the controlling regulations when deciding to allow gaming.

**1.  The Department agrees to take the Park City Parcel into trust and permit gaming on that land.**

Congress enacted a federal statute (Public Law 98-602) to compensate the Wyandotte Nation for land that had been ceded to the United States. *Sac and Fox Nat. of Missouri v. Norton*, 240 F.3d 1250, 1255 (10th Cir. 2001). Under this statute, the federal government gave the Wyandotte Nation $100,000 to buy land, which the United States would then take into trust. *Id*.

With this payment, the Wyandotte Nation bought land known as *the Park City Parcel*. The Wyandotte Nation asked the Department of the Interior to take this land into trust, stating that the purchase price had come out of the statutory funds. The Department agreed, and the Wyandotte Nation further requested authorization to conduct gaming on the land.

Gaming is generally prohibited under federal law. 25 U.S.C. § 2719(a). But an exception exists under statutory and regulatory provisions for tribal land trusts. 25 U.S.C. § 2719(a)(1) & (b); 25 C.F.R. § 292.5. The Department of the Interior invoked the statute to allow gaming on the Park City Parcel. In applying the exception, however, the Department failed to discuss its own regulations.

2

**2.     We review the Department's determinations under the arbitrary-and-capricious standard.**

We conduct de novo review of the district court's ruling. *Sac & Fox Nat'n of Missouri v. Norton*, 240 F.3d 1250, 1260 (10th Cir. 2001). The district court could set aside the Department's decision only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *S. Utah Wilderness Alliance v. Dep't of the Interior*, 44 F.4th 1264, 1272 (10th Cir. 2022) (quoting 5 U.S.C. § 706(2)(A)). We'd regard the Department's decision as arbitrary and capricious if it

- overlooked an important aspect of the problem,

- explained its decision in a way that conflicted with the evidence or was so implausible that it could not be ascribed to a difference in view or the product of agency expertise,

- failed to base the decision on consideration of the relevant factors, or

- made a clear error of judgment.

*Id*. at 1273.

**3.     The Department adequately explained any deviation from the internal memoranda.**

The governmental and tribal challengers rely in part on three departmental memoranda, which discussed the status of the Wyandotte Nation's $100,000 in statutory funds. According to the governmental and tribal challengers, the memoranda established a policy prohibiting the

3

Department from taking more land into trust if the land had been purchased with the $100,000 in statutory funds.

The memoranda grew out of the Department's prior decision to take another parcel (the Shriner Tract) into trust for the Wyandotte Nation. In the three memoranda, Department officials stated that the Wyandotte Nation had used all of the statutory funds to purchase the Shriner Tract.

In the first memorandum, a Department official represented that "[i]f the purchase price of the Shriner Tract exceeds $100,000, then the Department should state clearly that the settlement funds have been expended in accordance with the law, and that no funds remain to implement further the 'shall' of the law." Appellants' App'x vol. 7, at 106.

In the second memorandum, the Director of the Indian Gaming Management Staff stated that a local office needed to inform the Wyandotte Nation that (1) "the acceptance in trust of the Shriner Tract [had] exhaust[ed] the land acquisition authority of Pub. L. 98-602" and (2) other statutory authority would be needed for the Wyandotte Nation's "subsequent trust acquisitions." *Id.* at 114.

In the third memorandum, the Assistant Secretary of Indian Affairs wrote that upon transfer of the Shriner Tract into trust, someone needed to tell the Wyandotte Nation "that this trust acquisition [had] fulfill[ed] the [Department of the Interior's] obligation to take land in trust pursuant to Pub. L. 98-602." Appellants' App'x vol. 8, at 2.

4

The governmental and tribal challengers argue that

- these statements represent a departmental policy not to take more land into trust under Public Law 98-602 and

- the Department violated its own policy, without explanation, by taking the Park City Parcel into trust.

For this argument, the governmental and tribal challengers must show that the Department

- had a policy against taking more land into trust under Public Law 98-602,

- violated this policy by taking the Park City Parcel into trust, and

- failed to explain its deviation from this policy.

I agree with the majority that the Department adequately addressed any possible deviation from the approach taken in the memoranda. When the Shriner Tract was purchased, the Department's accounting records showed that the Wyandotte Nation had used all of the statutory funds. After issuance of the memoranda, however, the Department revised its accounting and concluded that the Wyandotte Nation still had enough statutory funds and earnings to buy the Park City Parcel. Appellants' App'x vol. 14, at 16 n.37; *see* Maj. Op. at 24–26.

The new accounting led the Department to approve the Wyandotte Nation's request to take the Park City Parcel into trust under Public Law 98-602. In approving this request, the Department said that it was incorporating documentation showing that the Wyandotte Nation hadn't

5

used all of the statutory funds and earnings to buy the Shriner Tract. Appellants' App'x vol. 14, at 73–74. Given this statement, I agree that the Department adequately explained its deviation from the approach taken in the memoranda.

But the majority goes further, expressing doubt that the memoranda had constituted an administrative policy. Maj. Op. at 38–39. I see no need to address the existence of an administrative policy in light of the Department's explanation.

## 4.    The Department failed to discuss the regulations controlling the gaming determination.

I also regard the gaming determination as arbitrary and capricious because the Department failed to address the controlling regulations.

A federal statute generally forbids gaming "on lands acquired by the [Department] in trust for the benefit of an Indian tribe after October 17, 1988." 25 U.S.C. § 2719(a). But the statute creates an exception for "lands [that] are taken into trust as part of . . . a settlement of a land claim." 25 U.S.C. § 2719(b)(1)(B)(i).

The Department enacted regulations to apply this exception. 25 C.F.R. § 292.5. These regulations permit gaming on land "[a]cquired under a settlement of a land claim that resolves or extinguishes with finality the tribe's land claim in whole or in part, thereby resulting in the alienation or

6

loss of possession of some or all of the lands claimed by the tribe, in legislation enacted by Congress." 25 C.F.R. § 292.5(a). !!

The Department applied the federal statute, but not the federal regulations. The failure to apply the regulations rendered the Department's decision arbitrary and capricious. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (concluding that an administrative law judge's action was unsupported because the judge hadn't discussed the critical regulations); *Chicano Educ. and Manpower Servs. v. Dep't of Labor*, 909 F.2d 1320, 1327 (9th Cir. 1990) (stating that agencies must follow and discuss their own regulations).

The majority "acknowledge[s] that the [Department of the Interior] . . . did not outwardly consider the effect of the . . . regulations." Maj. Op. at 47. Instead, the Department waited until the case was in district court to explain why the gaming determination complied with the regulations. But the Department's decision "must be upheld, if at all, on the basis articulated by the [Department] itself." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 50 (1983). Given the failure to apply the controlling regulations, the Department acted arbitrarily and capriciously by allowing gaming on the land.

**5.      Remand is appropriate for the Department to address the effect of the regulations on the gaming determination.**

Given the Department's disregard of its controlling regulations, I would reverse and remand, instructing the district court to vacate the gaming determination and to remand for the Department of the Interior to reconsider this determination based on the controlling regulations (29 C.F.R. § 292.5).

The majority states that

- the governmental and tribal challengers asked this Court "to reverse the . . . gaming determination" and

- their "briefing thus puts the 2008 regulations at issue before us for a legal determination."

Maj. Op. at 48 n.23. I respectfully disagree. In their opening brief, the governmental and tribal challengers ask us to "set aside" the "Gaming Determination" and remand to the Department. Appellants' Opening Br. at 57. Given this request, we should reverse, instructing the district court to vacate the Department's gaming determination and to remand for the Department to reconsider this determination based on the controlling regulations.